UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| KRISTI CHANLEY, Special Administrator | ) | |
| of the Estate of TERRY CHANLEY | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:21-cv-155-MPB-MJD |
| | ) | |
| CITY OF EVANSVILLE, INDIANA; et al | ) | |
| Defendants | ) | |

**OFFICER REID'S BRIEF IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Comes now Defendant, Mario Reid ("Officer Reid"), by counsel, pursuant to this Court's

Local Rule 56-1(a), and hereby submits his Brief in Support of Motion for Summary Judgment.

**INTRODUCTION**

On October 28, 2019, Terry Chanley – with a deadly weapon in his right hand – charged

at Evansville police officer Mario Reid. It was a fast-evolving situation that required split second

decision-making and action by Officer Reid. He feared for his life, and there were civilians in the

immediate vicinity. Officer Reid gave Terry several verbal commands to show his hands, all of

which Terry ignored. As Terry continued to quickly advance toward Officer Reid, Officer Reid

fired four shots, two struck and killed Terry. Kristi Chanley, Terry's widow, brings this lawsuit

claiming that Officer Reid's use of force was excessive and that Officer Reid failed to render

medical aid to Terry. As explained below, Officer Reid's use of deadly force was objectively

reasonable under the circumstances and he did not fail to render medical aid. Further, Officer

Reid is entitled to qualified immunity as to both claims. Accordingly, Officer Reid is entitled to summary judgment on all claims remaining against him[1]:

- Count I- Violation of Fourth Amendment under 42 U.S.C. § 1983 for excessive use of force [Dkt. No. 1 at ¶¶ 61-74; Dkt. No. 123 at ¶ 1(a)(i.)-(v.)]; and

- Count I- Count I- Violation of Fourth Amendment under 42 U.S.C. § 1983 for failure to render and direct medical aid [Dkt. No. 1 at ¶ 61-74; Dkt. No. 123 at 1(b)(i).]

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE[2]

1. Terry Chanley ("Terry"), a 45-year-old male, resided in Wadesville, Indiana. [Dkt. No. 1 at ¶ 4.]

2. Prior to his death on October 28, 2019, Terry worked for J & L Acoustics as a drywall installer/painter. [Dkt. No. 128-1 at 5 (Kristi Dep. at 10:11-18).]

3. Terry did not go to work on October 28, 2019. [Dkt. No. 128-1 at 5 (Kristi Dep. at 10:9-10).]

4. On that day, at approximately 09:30, Terry called his wife, Kristi Chanley ("Kristi"), who was at work herself, and asked Kristi to come home to be with him. [Dkt. No. 128-1 at 7 (Kristi Dep. at 12:3-9).]

5. This was an unusual request from Terry. [Dkt. No. 128-1 at 7 (Kristi Dep. at 12:18-22).]

---

[1] Pursuant to this Court's Order on Defendant's Motion for Judgment on the Pleadings, Counts 4-6, 8, and the prayer for equitable relief of the Complaint have been dismissed. [Dkt. No. 88 at 10.]

[2] Officer Reid accepts the following facts as true only for purposes of summary judgment. Officer Reid reserves the right to contest any of these facts at trial.

6.    Terry had been "depressed" and not "himself" in the days leading up to October 28, 2019. [Dkt. No. 128-1 at 11 (Kristi Dep. at 16:9-11).]

7.    Terry was diagnosed with acute psychosis in June of 2019 and was also being treated for depression at the time of his death. [Dkt. No. 128-1 at 9, 27, 34 (Kristi Dep. at 14:24-25, 32:12-16, 39:12-21).]

8.    Terry was paranoid – he believed and told Kristi on more than one occasion that "people were trying to get him," that there was a "hit" on him for $40,000, and he needed a gun to protect himself. [Dkt. No. 128-1 at 23, 25 (Kristi Dep. at 28:15-24, 30:23-31:2).]

9.    Terry's adult son secured the guns located in the Chanley residence to keep Terry from harming himself or others (the guns were put in a safe). [Dkt. No. 128-1 at 26, 33 (Kristi Dep. at 31:3-13, 38:13-15).]

10.    Once home from work, Kristi observed that Terry appeared to be "down" and spent most of the day at home with him. [Dkt. No. 128-1 at 13 (Kristi Dep. at 18:8-14).]

11.    Around 17:00, Terry asked Kristi to leave the home and buy him some liquor. [Dkt. No. 128-1 at 14-15 (Kristi Dep. at 19:17-18, 20:2-3).]

12.    Kristi refused because Terry was in a "bad mood." [Dkt. No. 128-1 at 14-15 (Kristi Dep. at 19:17-20, 20:2).]

13.    Terry proceeded to leave the home, presumably to get liquor, which Kristi knew meant Jim Beam. [Dkt. No. 128-1 at 14-15 (Kristi Dep. at 19:21-25, 20:3).]

14.    Terry left in his vehicle: a Jeep Wrangler (the "Jeep"). [Dkt. No. 128-1 at 17-18 (Kristi Dep. at 22:22-23:3).]

15.    At approximately 18:29:20, Mario Reid ("Officer Reid"), an Officer with the Evansville Police Department ("EPD"), was dispatched to a single-vehicle accident near Morgan

Avenue and Theater Drive in Evansville. [Dkt. No. 131-2 at 1; Dkt. No. 128-3 at 5 (Reid Dep. at 48:8-15).]

16.     Carl Hoffman ("Hoffman") witnessed the accident. [Dkt. No. 128-4 at 4-5, 9 (Hoffman Dep. at 9:25-10:4, 14:15-16).]

17.     Hoffman saw Terry slam on the brakes and make a 90 degree turn into a utility pole. [Dkt. No. 128-4 at 4-5, 11, 9 (Hoffman Dep. at 9:25-10:4, 14:15-16).]

18.     Hoffman did not observe anything that would have provided a reason for the Jeep to swerve off of the road. [Dkt. No. 128-4 at 5 (Hoffman Dep. at 10:8-19).]

19.     Hoffman was facing southbound, stopped at the traffic light controlling the Morgan Avenue/Theatre Drive intersection when the accident occurred. [Dkt. No. 128-4 at 4-5 (Hoffman Dep. at 9:15-10:1-7).]

20.     Hoffman proceeded through the intersection, made a U-Turn and stopped his white Toyota Prius (the "Prius") in the east bound lane closest to the crashed Jeep. [Dkt. No. 128-4 at 4-5, 7 (Hoffman Dep. at 9:15-16, 10:1-4, 12:10); Dietz Video, 0:00:00-00:00:44.]

21.     Hoffman approached Terry and asked if he was all right. [Dkt. No. 128-4 at 7 (Hoffman Dep. at 12:23-24).]

22.     Terry gave conflicting answers[3] and "sounded funny" when he responded. [Dkt. No. 128-4 at 8 (Hoffman Dep. at 13:3-7).]

23.     Two (2) more civilians, Emily Dietz ("Dietz") and Davin Robinett ("Robinett"), saw the Jeep off the south side of Morgan Avenue; they stopped to assist, parking directly across the street. [Dkt. No. 128-5 at 5, 7 (Dietz Dep. at 9:3-4, 11-24.).]

---

[3] At one point answering "yeah," he was alright and the next answer "no," he's not okay. [Dkt. No. 128-4 at 7-8 (Hoffman Dep. at 12:23-13:7).]

24.     Robinett went to see if Terry needed help. [Dkt. No. 128-5 at 5-6 (Dietz Dep. at 9:21, 10:25).]

25.     Dietz remained in the car, was videoing on a social media platform and proceeded to film some of the events. [Dkt. No. 128-5 at 10 (Dietz Dep. at 14:2-7); Dietz Video.]

26.     Robinett noticed the driver appeared "detached . . . like he wasn't there" and "almost in a dissociative state." [Dkt. No. 128-6 at 5, 10 (Robinett Dep. at 7:22-23, 12:8-9).]

27.     Almost immediately, Robinett became "uncomfortable" and "uneasy;" he described the scene as ominous. [Dkt. No. 128-6 at 5, 12 (Robinett Dep. 7:23-24, 14:17-21).]

28.     Another civilian, Robert Mangold ("Mangold"), was traveling west on Morgan Avenue and also saw the Jeep off the road and against a utility pole. [Dkt. No. 128-7 at 5-6 (Mangold Dep. at 9:13-25 & 10:2-4).]

29.     Mangold drove to the area of the Jeep and parked his vehicle, a white Chevrolet Suburban (the "Suburban") behind Hoffman's Prius, to the west of the Jeep. [Dkt. No. 128-7 at 6 (Mangold Dep. at 10:25); Dietz Video, 0:00:25.]

30.     Mangold called 911. [Dkt. No. 128-7 at 67 (Mangold Dep. at 11:14-15).]

31.     The records for the central dispatch center show that it requested an ambulance in response to Mangold's call at 18:29:12. [Dkt. No. 131-2 at 1.]

32.     Mangold then walked to the Jeep and saw Terry. [Dkt. No. 128-7 at 8 (Mangold Dep. at 12:5-10).]

33.     Mangold saw Terry reaching in the back of the Jeep for a hammer and saw Terry with a hammer in his hand. [Dkt. No. 128-7 at 9-10 (Mangold Dep. at 13:15-14:14).]

34.     Soon thereafter, Mangold observed Terry let go of the hammer. [Dkt. No. 128-7 at 10-11, 24-25 (Mangold Dep. at 14:12-15:22, 51:22-52:8).]

35.     Mangold tried to talk to Terry while still on the 911 call. [Dkt. No. 128-7 at 8 (Mangold Dep. at 12:5-16).]

36.     Mangold thought Terry was impaired. [Dkt. No. 128-7 at 9 (Mangold Dep. at 13:4-6).]

37.     With lights and sirens engaged, Officer Reid arrived on scene at approximately 18:30:44. [Dkt. No. 131-2 at 1; Reid Dash Cam, 0:00:30-0:01:53.]

38.     When Officer Reid approached the Jeep, Hoffman told Officer Reid that he thought Terry was "drunk, high." [Reid Body Cam, 0:00:47-51; Dkt. No. 128-4 at 8 (Hoffman Dep. at 13:21-24).]

39.     Hoffman, Mangold, and Officer Reid then moved to the driver's side of the Jeep, which was open. [Reid Body Cam, 0:00:58-0:01:05; Dkt. No. 128-5 at 6 (Dietz Dep. at 10:23-24).]

40.     Robinett was still standing near the Jeep. [Reid Body Cam, 0:00:58-0:01:05.]

41.     Officer Reid moved closer to Terry, who was still seated inside the Jeep. [Reid Body Cam, 0:01:06.]

42.     Officer Reid asked Terry: "How are we doin' Sir? You doin' alright?" [Reid Body Cam, 0:01:06.]

43.     Terry did not respond. [Reid Body Cam, 0:01:10.]

44.     Officer Reid noticed that Terry seemed to be looking past him with a "thousand-yard stare." [Dkt. No. 128-3 at 7 (Reid Dep. at 50:4-8).]

45.     Robinett observed Terry holding what he [Robinett] thought was a gun. [Dkt. No. 128-6 at 14 (Robinett Dep. at 16:15-24).]

46.     The handle appeared to be wrapped in black electrical tape and the way Terry was holding the object led Robinett to believe it was a gun. [Dkt. No. 128-6 at 14 (Robinett Dep. at 16:16-21).]

47.     Terry was wearing a black T-shirt with a white graphic on the front, blue jeans with significant paint splatter, and brown boots. [Reid Body Cam, 0:01:19-0:01:30.]

48.     Officer Reid continued to engage Terry in conversation, asking if Terry had his license, registration, and proof of insurance. [Reid Body Cam, 0:01:12.]

49.     Terry responded "no." [Reid Body Cam, 0:01:14.]

50.     Officer Reid turned on his flashlight so he could better see Terry. [Reid Body Cam, 0:01:18.]

51.     Officer Reid recognized Terry exhibiting "pre-attack indicators." [Dkt. No. 128-3 at 17-18 (Reid Dep. at 82:12-83:4); Reid Body Cam, 0:01:18-33.]

52.     Officer Reid's prior training with EPD taught him how to recognize pre-attack indicators or behaviors when interacting with individuals. [Dkt. No. 128-3 at 17-18 (Reid Dep. at 82:2-83:4).]

53.     Pre-attack indicators includes indirect eye contact, furtive movements, concealment of hands or an object, stretching, and not responding to verbal cues. [Dkt. No. 128-3 at 17-18 (Reid Dep. at 82:2-83:4).]

54.     Terry was sitting with his left leg outside of the Jeep and his left hand resting on his left thigh. [Reid Body Cam, 0:01:18.]

55.     Terry's right hand was concealed. [Dkt. No. 128-3 at 17-18 (Reid Dep. at 82:12-83:-4); Reid Body Cam, 0:01:18.]

56.     Continuing to verbally engage Terry, Officer Reid asked "What's going on?" [Reid Body Cam, 0:01:19-22.]

57.     Terry did not respond; he moved his eyes around with a blank stare. [Reid Body Cam, 0:01:19-22.]

58.     Terry leaned forward and to his left, looking under the steering wheel. [Reid Body Cam, 0:01:24.]

59.     Terry looked back to Officer Reid, nodded, and leaned to his right – all without breaking his staring gaze toward Officer Reid. [Reid Body Cam, 0:01:28.]

60.     Terry's right arm remained concealed by Terry's body and under the driver's seat of the Jeep. [Reid Body Cam, 0:01:28.]

61.     Concerned, Officer Reid asked Terry what he was reaching for. [Reid Body Cam, 0:01:28-30.]

62.     Terry did not respond; he did, however, lean farther to his right and was digging within the Jeep with his right hand, while continuing his blank stare at Officer Reid. [Reid Body Cam, 0:01:28-30.]

63.     Hoffman, Robinett, and Mangold all observed Terry reaching under his seat repeatedly despite Reid's commands to stop and show his hands. [Dkt. No. 128-4 at 16 (Hoffman Dep. at 21:19-24); Dkt. No. 128-6 at 14-16 (Robinett Dep. at 16:25-17:12, 18:16-21); Dkt. No. 128-7 at 16-17 (Mangold Dep. at 20:11-21, 21:19-22).]

64.     Robinett observed Terry pull a gun out from under the seat (at least that's what he believed at the time). [Dkt. No. 128-6 at 15-17 (Robinett Dep. at 17:5-15, 18:16-21).]

65.     Hoffman became fearful for his own safety as Terry continued digging under the driver's seat. [Dkt. No. 128-4 at 16, 21 (Hoffman Dep. at 21:19-24, 26:12-17).]

66.     Officer Reid stepped back and drew his service weapon. [Reid Body Cam, 0:01:31-32.]

67.     Officer Reid repeatedly used the term "whoa" to Terry, and repeatedly commanded Terry to show his hands. [Reid Body Cam, 0:01:31-35.]

68.     Audibly distressed, Officer Reid continued verbal commands to Terry, demanding to see Terry's hands. [Reid Body Cam, 0:01:34-35.]

69.     Officer Reid also continued to create distance between himself and Terry by moving toward the rear of the Jeep. [Reid Body Cam, 0:01:34-35.]

70.      Officer Reid commanded Terry to step out of the vehicle. [Reid Body Cam, 0:01:38.]

71.     Terry reached back and to the right with his right arm out of Officer Reid's view. [Reid Body Cam, 0:01:37.]

72.     Officer Reid observed Terry's facial expression change. [Dkt. No. 128-3 at 8 (Reid Dep. at 51:1-3).]

73.     Officer Reid then saw a black object, which he believed to be a gun, pointed directly at him [Officer Reid]. [Dkt. No. 128-3 at 8 (Reid Dep. at 51:4-10).]

74.     Terry brought his leg out of the Jeep and swung around like he had a gun… and "had his left hand over his right." [Dkt. No. 128-4 at 17-18, 28-29 (Hoffman Dep. 22:24-23:1, 101:24-102:2).]

75.     Officer Reid attempted to position himself between the civilian bystanders and Terry because he thought they were still nearby. [Dkt. No. 128-3 at 8 (Reid Dep. at 51:6-15).]

76.     Seeing what he believed was a gun directly pointed at him, Officer Reid fired two shots at Terry and continued to move backwards towards the road and away from Terry. [Dkt. No. 128-3 at 8 (Reid Dep. at 51:7-23); Reid Body Cam, 0:01:38-49; Dietz Video, 0:00:07-14.]

77.     At the same time, Terry exited the Jeep with the weapon and charged toward Officer Reid. [Dkt. No. 128-3 at 9 (Reid Dep. at 52:21-24; Reid Body Cam, 00:01:38-49; Dietz Video, 0:00:07-14; Dkt. No. 128-5 at 28 (Dietz Dep. at 47:18-25).]

78.     Terry was moving quickly towards Officer Reid with a weapon and ignored Officer Reid's commands to show his hands. [Dkt. No. 128-3 at 9 (Reid Dep. 52:21-24); Reid Body Cam, 0:01:38-49; Dietz Video, 0:00:07-14; Dkt. No. 128-5 at 28 (Dietz Dep. at 47:18-25).]

79.     Dietz observed Terry moving quickly towards Officer Reid. [Dkt. No. 128-5 at 28-29, 35 (Dietz Dep. at 47:18-48:1, 54:10-13).]

80.     At 18:32:50, Officer Reid called out on the radio: "Shots fired! Shots fired!" and he continued to tell Terry "Let me see your hands! Let me see your hands!" [Reid Body Cam, 0:01:43-46; Dkt. No. 131-2 at 7.]

81.     As Terry continued to charge at Officer Reid, Officer Reid continued to move backwards towards his cruiser and fired a third shot at Terry. [Dkt. No. 128-3 at 8 (Reid Dep. at 51:16-20); Reid Body Cam, 0:01:43-46.]

82.     Three seconds later, as Terry was still charging him, Officer Reid fired a fourth shot at Terry. [Reid Body Cam, 0:01:46; Dietz Video, 0:00:13-14.]

83.     Terry fell forward onto the road coming toward Officer Reid near the center line and at the rear left corner of Hoffman's Prius. [Reid Body Cam, 0:01:54; Reid Dash Cam, 0:02:58-59.]

84.     Six seconds elapsed between Terry exiting the Jeep and coming to rest on the pavement. [Reid Body Cam, 0:01:40-46.]

85.     Terry landed on his stomach, and his right hand was concealed underneath his body. [Henrich Body Cam, 0:01:04-1:07; Dkt. No. 128-14 at 5 (Seibert Dep. at 50:9-10).]

86.     Officer Reid screamed "oh my God!" but he continued to point his service weapon on Terry until backup arrived. [Dkt. No. 128-3 at 9 (Reid Dep. at 52:17-20; Reid Body Cam, 0:02:00-04:02; Reid Dash Cam, 0:03:22-05:13.]

87.     Officer Reid believed that Terry still posed a threat to himself and others on scene. [Dkt. No. 128-3 at 9 (Reid Dep. at 52:17-20).]

88.     Officer Reid radioed: "Tell AMR to pick it up!" [Reid Body Cam, 0:01:58-59.][4]

89.     He did so again ten seconds later, yelling: "Have AMR step it up!" [Reid Body Cam, 0:02:09.]

90.     At 18:33:42, prior to the arrival of backup officers on scene, Officer Reid called out on the dispatch radio that he had a "subject down." [Amuzie Body Cam 0:03:24; Dkt. No. 131-2 at 7.]

91.      A firetruck from the Evansville Fire Department arrived on scene at 18:33:48. (Dkt. No. 131-2 at 7.]

92.     EPD backup officers first arrived at 18:33:50. [Reid Body Cam, 0:01:48; Dkt. No. 131-2 at 2.]

93.     EPD Officer Matthew Henrich ("Officer Henrich") and his partner, Officer Tyler George ("Officer George"), arrived on scene first and tried to determine where the suspect was,

---

[4] "AMR" = American Medical Response. [Dkt. No. 128-13 at 5 (Kemmerer Dep. 7:23-24).]

if Officer Reid was alright and where Terry's weapon was located. [Matthew Henrich Body Cam, 0:00:40-52, 0:01:02-1:16.]

94.     Officer Henrich exited his vehicle, drew his service weapon, and made his way to Officer Reid. [Henrich Body Cam, 0:00:54-0:01:02.]

95.     Officer Henrich took over Officer Reid's position to the left front bumper of Mangold's vehicle, near the center line; Reid left the active scene. [Henrich Body Cam, 0:00:54-01:05.]

96.     Officer Reid removed himself to the rear of his cruiser on the east side of the Jeep and attempted to calm himself. [Reid Body Cam, 0:04:20-06:15.]

97.     Officer Reid advised firefighters that he had not been physically injured. [Reid Body Cam, 0:04:20-06:15.]

98.     Officer Reid repeatedly yelled: "Oh shit, oh shit… Oh God, oh God." [Reid Body Cam, 0:04:20-05:20.]

99.     EPD Officer Nathan Jones ("Officer Jones")[5] arrived and took Officer Reid to his [Officer Jones'] cruiser. [Reid Body Cam, 0:06:12-37.]

100.    Officer Reid identified Terry's Jeep to Officer Jones. [Reid Body Cam, 0:06:38-42.]

101.    Officer Reid then told Officer Jones: "Tell them he [Terry] dropped something." [Reid Body Cam, 0:07:00-04.]

102.    According to Officer Jones' body camera video from the incident, he did not tell the other officers on scene that Terry "dropped something." [*See generally* Jones Body Cam.]

---

[5] Officer Jones is not a named Defendant in this cause of action.

103.     According to the dispatch radio traffic, Officer Jones did not tell the other officers on scene that Terry dropped something. [Dispatch Audio Recording.]

104.     Officer Reid told Officer Jones: "Oh my God, I thought I was going to die." [Reid Body Cam, 0:07:40-42.]

105.     Officer Reid then told Officer Jones that he was going to throw up. [Reid Body Cam, 0:08:05-06.]

106.     Shortly thereafter, Officer Reid was transported to EPD headquarters to begin the Officer-Involved Shooting investigation process per the EPD Operational Guidelines. [Dkt. No. 128-3 at 10 (Reid Dep. at 53:15-20).]

107.     EPD Officer Christopher Seibert ("Officer Seibert"), who arrived on scene at 18:36:55, advised over the radio that Terry had a gun under his stomach and was still moving. [Reid Body Cam, 0:08:24-26.]

108.     Crying, Officer Reid replied: "He pointed something black at me!" [Reid Body Cam, 0:08:44-45.]

109.     The AMR ambulance arrived at 18:37:04. [Dkt. No. 128-39 at 5.]

110.     The City of Evansville has a contract with AMR to cover its 911 services. [Dkt. No. 128-8 at 6 (Turpen Dep. at 6:1-9).]

111.     Logan Kemmerer, an AMR employee was dispatched to the scene of a motor vehicle accident. [Dkt. No. 128-13 at 8 (Kemmerer Dep. at 10:11-13).]

112.     After they arrived, an officer advised AMR that someone had a firearm and instructed them to wait behind the firetrucks. [Dkt. No. 128-13 at 12 (Kemmerer Dep. at 14:1-5).]

113.     Kemmerer described the scene as being "pretty frightening," and he was scared. [Dkt. No. 128-13 at 12 (Kemmerer Dep. at 14:6-14).]

114.     Per Dietz, the civilian who was recording with her iPhone: "… [Officer Reid] did his job to ensure the safety of not only myself, my daughter and the people that were around, but for himself." [Dietz Dep. 128-5 at 42 (Dietz Dep. at 65:6-10).]

115.     Terry sustained two non-contact gunshot wounds, one to the left chest resulting in a perforation of the left hepatic lobe of his liver, and another to the dorsal left hand.[6] [Dkt. 128-9 at 1-3.]

116.     Terry's cause of death was attributed to a gunshot wound to his left chest, which resulted in a perforation of his left hepatic lobe, or liver [Dkt. No. 128-9 at 3.]

117.     It was later learned that Terry wasn't holding a gun, he was holding a hammer. [Dkt. No. 128-6 at 14 (Robinett Dep. at 16:9-21).]

118.     The hammer held by Terry was located in the grass near the Jeep, as shown in the following photographs. [Dkt. No. 131-3 at ¶ 4.]

---

[6] Elsewhere in the autopsy report Dr. Jacobi distinguished the injury to the left hand as comprising two separate gunshot wounds, one representing an entrance wound, and the other representing an exit wound. [Dkt. No. 128-9 at 2.]





119.    The hammer is depicted in the photo below. [Dkt. No. 128-7 at ¶¶ 4, 5.]



## SUMMARY JUDGMENT STANDARD OF REVIEW

"Summary judgment is the 'put up or shut up' moment in a lawsuit." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). As recently explained by this Court:

> Federal Rules of Civil Procedure 56 provides that summary judgment should be granted when the evidence establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 . . . . The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 587 . . . . Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.* at 255 . . . . However, neither the "mere existence of some alleged factual dispute between the parties," *id.* at 247 [], nor the existence of "some metaphysical doubt as to the material facts, *id.* at 586 [], will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). The nonmovant may not simply rest on the pleadings but must affirmatively demonstrate by specific factual allegations that a genuine issue of material fact exists for trial. *Payne v. Pauley*, 337 F.3d 767, 777 (7th Cir. 2003).

*Darnell v. Wal-Mart Stores, Inc.*, Cause No. 1:16-cv-02754-MPB-JMS, 2018 WL 573094 at *1 (S.D. Ind. 2018).

## USE OF FORCE – AN OVERVIEW

The Supreme Court set out the fundamental framework for analyzing excessive-force claims in *Tennessee v. Garner*, 471 U.S. 1 (1985) and *Graham v. Connor*, 490 U.S. 386 (1989). *See also Cty. of L.A. v. Mendez*, 581 U.S. 420 (2017). Determining whether a use of force is reasonable under the Fourth Amendment requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. This reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

"The operative question in excessive force cases is 'whether the totality of the circumstances justifie[s] a particular sort of search or seizure.'" *Mendez*, 581 U.S. at 427 (quoting *Garner*, 471 U.S. at 8-9). Courts evaluate excessive-force claims for objective reasonableness "based upon the information the officers had when the conduct occurred." *Mendez*, 581 U.S. at 428 (quoting *Saucier v. Katz*, 533 U.S. 194, 207 (2001)).

Courts "evaluate excessive-force claims for objective reasonableness based on the information the officers had at the time." *Horton v. Pobjecky*, 883 F.3d 941, 949 (7th Cir. 2018) (citing *Mendez*, 581 U.S. at 428 (2017)). "What is important is the amount and quality of the information known to the officer at the time he fired the weapon when determining whether the officer used an appropriate level of force." *Muhammed v. City of Chi.*, 316 F.3d 680, 683 (7th Cir. 2002) (internal citation omitted).

Courts "must refuse to view the events through hindsight's distorting lens." *Horton*, 883 F.3d at 950 (citing *Graham*, 490 U.S. at 397). "We must consider the totality of the circumstances, including the pressures of time and duress, and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances. *Id.* (citing *Ford v. Childers*, 855 F.2d 1271, 1277 (7th Cir. 1988). We must recognize that in such circumstances, officers often lack a judge's luxury of calm, deliberate reflection. *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (quoting *Graham*, 490 U.S. at 396-97).

## USE OF DEADLY FORCE

"A police officer may constitutionally use deadly force to defend himself and others in certain situations." *Horton,* 883 F.3d at 949. "It is clear that, when an individual threatens a police officer with a deadly weapon, the officer is permitted to use deadly force in self-defense if the use is consistent with the principles set forth in *Tennessee v. Garner*." *Id.* (quoting *Scott v. Edinburg*, 346 F.3d 752, 757 (7th Cir. 2003)).

When an officer reasonably believes an assailant's actions place "him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988). An officer does not violate the Fourth Amendment by firing at a suspect when the officer "**reasonably believed that the suspect** . . . **was armed with a deadly weapon**, and was likely to pose a danger of serious harm to others if not immediately apprehended." *Horton*, 883 F.3d at 949 (quoting *Ford,* 855 F.2d at 1275) (emphasis added).

"It bears noting that the availability of less severe alternatives does not necessarily render the use of deadly force unconstitutional." *Horton*, 883 F.3d at 950. The Fourth Amendment does not require "the use of the least or even a less deadly alternative so long as the use of deadly force is reasonable under *Tennessee v. Garner* and *Graham v. Connor*." *Id.* (quoting *Plakas v. Drinski*, 19 F.3d 1143, 1149 (7th Cir. 1994)).

## OFFICER REID'S USE OF DEADLY FORCE
## WAS OBJECTIVELY REASONABLE UNDER THE CIRCUMSTANCES

The Seventh Circuit and this Court have both entered summary judgment in favor of an officer who shot a suspect under the reasonable belief that the suspect had a gun. In *Henning v. O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007), the Court found that two officers reasonably

believed a suspect who was engaged in a struggle with them had gotten his hands on or near a gun, which gave them the requisite reasonable cause to use deadly force.

More recently, in *McKnight v. Taylor,* 210 F.Supp. 3d 1069, 1070 (S.D. Ind. 2016), this Court entered summary judgment to an officer after he used deadly force on a suspect who was "holding a black object five-to-six inches long in his left hand, which was hanging by his left thigh." *Id.* at 1075. The object was a phone. *Id.* This Court determined that the officer "shouted his own command to [the suspect] to drop the gun and, when there was no immediate response to that command, [the officer] made the split-second decision to use deadly force." *Id.* at 1076. This Court concluded that the officer's decision to use deadly force was objectively reasonable. *Id.*

When considering the facts and circumstances of this particular case as applied to the controlling law, it is clear that Officer Reid's use of deadly force was objectively reasonable.

Immediately upon his arrival, Officer Reid received information from a civilian witness who relayed to Officer Reid that he believed Terry was intoxicated. [Fact, ¶ 38.] While the three civilians who stopped to check on Terry remained in close proximity, Officer Reid approached Terry, who from the outset displayed concerning behavior, including his failure to respond to Officer Reid's question of whether he was ok and staring at Reid with a "thousand-yard stare." [Facts, ¶¶ 39-44.] While Terry can be heard answering Officer Reid's question about his license and registration, Terry's concerning behavior continued thereafter, looking under the steering wheel and reaching around the floorboard, prompting Officer Reid to ask him what he was reaching for. [Facts, ¶¶ 48, 49, 51, 58, 60-63, 65.]

Based on his training, Officer Reid interpreted this behavior as pre-attack indicators. [Facts, ¶¶ 51-53.]. Knowing that he had a duty to protect the nearby civilians, Officer Reid gave Terry multiple commands to stop what he was doing and show his hands, as he simultaneously

drew his firearm. [Facts, ¶¶ 66-68, 75]. Officer Reid's attempts to deescalate the situation and gain compliance through these lawful commands had no effect on Terry. [Fact, ¶ 71.] Instead, Terry continued his blank gaze at Officer Reid while reaching throughout the Jeep. [Facts, ¶¶ 62, 71.] Officer Reid further attempted to deescalate the situation by backing away from Terry. [Fact, ¶ 69.]

When ordered to "step out of the vehicle", Terry instead defied Officer Reid's commands once more by again reaching into the Jeep. [Facts, ¶¶ 70-71.] After grabbing the black object now known to be a black handled hammer, Terry swung his body around with the hammer in his hand. [Facts, ¶¶ 46, 64, 73, 74.] Terry exited the vehicle; but make no mistake, he did not surrender. [Fact, ¶ 77.] Terry immediately began charging at Officer Reid, prompting Officer Reid to fire two shots at Terry. [Facts, ¶¶ 76, 77.] Undeterred, Terry continued his advance on Officer Reid, while Officer Reid continued to back pedal and attempt to create distance between himself and Terry. [Facts, ¶¶ 78-81.] As Terry continued his chase, Officer Reid fired a third shot. [Fact, ¶ 81.] When Officer Reid's third shot proved ineffective in stopping Terry's advance, he fired a fourth shot as Terry reached the back right corner of the Prius. [Facts, ¶¶ 82, 83.] Despite the fourth shot, the momentum from Terry's charge carried the upper half of his body past the Prius, and he landed on the road with his head near the center line of the eastbound lanes of Morgan Avenue. [Fact, ¶ 83.]

It took only six seconds from when Terry exited the Jeep until he came to rest on the road. [Fact, ¶ 84.] In those six seconds, Terry exited the driver's seat and traveled the length of the Jeep, the additional distance between the rear of the Jeep and the curb, and almost the width of the southernmost eastbound lane of Morgan Avenue. [Facts, ¶¶ 77, 83.] While doing so, Terry disobeyed additional commands to show his hands and refused to surrender despite Officer

Reid's gunshots. [Facts, ¶¶ 77-82.] The undisputed material facts make clear that Terry had no intention of surrendering or obeying Officer Reid's commands, and instead posed an ongoing threat to Officer Reid.

Despite numerous opportunities to comply with Reid's commands, which would have eliminated any need for deadly force, Terry WENT on the offensive, wielding a black hammer (which Officer Reid reasonably perceived to be a gun), pointing it at Officer Reid, and charged at him. [Facts, ¶¶ 61-82.] If Officer Reid knew Terry was holding a hammer, he still would have been justified in using deadly force since a hammer becomes a deadly when "utilized in a harmful manner." *See Morris v. State,* 364 N.E.2d 132, 138 (Ind. 1977). There can be no doubt that Terry's charging of Officer Reid with a hammer shows that the hammer was to be "utilized in a harmful manner." *Id.*

Just as it was reasonable for the officer in *McKnight* to use deadly force against a suspect holding a large black object and refusing to comply with commands, so too was Officer Reid's decision to use deadly force against a suspect who refused to comply with commands and charged at him with a black object, later learned to be a hammer—a deadly weapon in itself. *McKnight*, 210 F. Supp. 3d at 1075. Officer Reid acted lawfully and under the reasonable belief that Terry was armed with a deadly weapon and that Terry posed an immediate risk of harm to himself and others. *Graham*, 490 U.S. at 396.

### Severity of the Crime at Issue

Through his conduct, Terry committed the offenses of felony intimidation, attempted felony battery against law enforcement, and resisting law enforcement. Intimidation is defined as "a person who communicates a threat with the intent that another person be placed in fear of retaliation for a prior lawful act." Ind. Code § 35-45-2-1(a)(2). Such threat can be by "words or

action" and becomes a level 5 felony when the person "draws or uses a deadly weapon." Ind. Code §§ 5-45-2-1(c), (b)(2)(A). "[I]nstrumentalities that are harmless in their general usage may nevertheless be regarded as lethal when utilized in a harmful manner." *Morris v. State*, 266 Ind. 473, 482 (1977) (A hammer was considered to be a "deadly weapon."). Terry's charge at Officer Reid with a hammer, therefore constituted level 5 felony intimidation. [Facts, ¶¶ 74-82.]

Similarly, attempted battery of an officer by means of a deadly weapon is a level 5 felony and occurs when an individual knowingly takes a substantial step toward touching the officer in a rude, insolent, or angry manner with a deadly weapon. Ind. Code 35-42-2-1(g)(2), *see Simmons v. State*, 126 N.E.3d 74 (Ind. Ct. App. 2019) (defining attempted battery against an officer by means of a deadly weapon as the foregoing). Further, a person attempts a crime, when, acting with the same culpability necessary for the offense, he engages in conduct constituting a "substantial step" toward the commission of the crime. Ind. Code § 35-41-5-1(a). This substantial step requirement is a minimal one which is defined as any overt act in furtherance of a crime. *B.T.E. v. State*, 108 N.E.3d 322, 327 (Ind. 2018). Here, Terry committed an attempted battery by means of a deadly weapon when he exited his vehicle brandishing a large black hammer and subsequently attacked Officer Reid with the hammer. [Facts, ¶¶ 74-82.]

Finally, an individual commits the offense of resisting law enforcement by "forcibly resist[ing], obstruct[ing], or interfere[ing] with a law enforcement officer . . . while the officer is lawfully engaged in the execution of the officer's duties." Ind. Code § 35-44.1-3-1(a). This elevates to a level 6 felony when the person "draws or uses a deadly weapon" in conjunction with resisting arrest. Ind. Code § 35-44.1-3-1(c)(1)(B)(i). Yet again, Terry's noncompliance with Officer Reid's commands and subsequent charging at Officer Reid with a large black hammer constituted the crime of resisting law enforcement, a level 6 felony. [Facts, ¶¶ 67-82.]

In sum, the severity of the crimes Terry committed—level 5 felony intimidation with a deadly weapon, level 5 felony attempted battery against an officer by means of a deadly weapon, and level 6 felony resisting law enforcement—further support a determination that Officer Reid's use of deadly force was objectively reasonable. *Graham*, 490 U.S. at 396

### Immediate Threat to the Safety of Officer Reid and Others

Officer Reid's use of force would have been justified simply based upon the threat that Terry posed to Officer Reid, but the presence of nearby civilians and passing motorists heightened the need for him to act quickly to subdue the threat posed by Terry. All told, Terry's continued reaching throughout the Jeep which prompted Officer Reid to draw his firearm until the final shot fired by Officer Reid spanned less than twenty seconds. [Facts, ¶¶ 60-84.] It was a clear example of "intense, dangerous, uncertain, and rapidly changing circumstances" that required Officer Reid to make "split-second" decisions. *See Horton*, 883 F.3d at 950. Any second guessing of Officer Red's split-second decision could only take place through the distorted lens of hindsight with the "luxury of calm, deliberate reflection," which the applicable precedent makes clear is not the standard for Fourth Amendment excessive force claims. *Id.*

### Terry was Actively Resisting

Despite numerous opportunities to comply with Officer Reid's commands which would have eliminated any need for deadly force, Terry instead decided to go on the offensive, wielding a black hammer, pointing it at Officer Reid, and attacking him. [Facts, ¶¶ 67-71, 73, 74, 76-82.] Even after the first three shots, Terry continued his advance upon Officer Reid as evidenced by the significant distance he traveled from the Jeep to where his body came to rest on the road, all in a matter of six seconds. [Facts, ¶¶ 82-84.] There can be no dispute that Terry continued to resist until Officer Reid's final shot, after which no further force was used.

Inasmuch, Officer Reid 's use of force was objectively reasonable under the circumstances—he is entitled to summary judgment in his favor.

### Officer Reid's Conduct Following His Use Of Force Was Objectively Reasonable

### Rendering medical aid--an overview

As for her failure to render medical aid claim against Officer Reid, Kristi specifically alleges that Officer Reid breached his duties as a police officer by "failing to report critical information." [Dkt. No. 123 at 1(b)(i)]. The undisputed material facts show otherwise, and Officer Reid is therefore entitled to summary judgment in his favor.

The Seventh Circuit has determined that a pre-trial arrestee has a right to reasonable medical care under the Fourth Amendment. *See Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006) ("Our cases thus establish that the protections of the Fourth Amendment apply at arrest and through the *Gerstein* probable cause hearing, due process principles govern a pretrial detainee's conditions of confinement after the judicial determination of probable cause, and the Eighth Amendment applies following conviction."); *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007); *Ortiz v. City of Chicago*, 656 F.3d 523, 530–31 (7th Cir. 2011); *see also Estate of Perry v. Wenzel*, 872 F.3d 439, 453 (7th Cir. 2017) (citing *Ortiz*, 656 F.3d at 530).

Claims regarding conditions of confinement for pretrial detainees are governed by the Fourth Amendment and its objectively reasonable standard. *Lopez*, 464 F.3d at 719. This objective standard assesses the totality of the circumstances "from the perspective of a reasonable officer on the scene." *Siler v. City of Kenosha,* 957 F.3d 751, 759 (7th Cir. 2020) (quoting *Graham,* 490 U.S. at 396.) "This perspective is critical," as a "court must consider the amount and quality of the information known to the officer at the time." *Id.* (quoting *Burton v. City of Zion,* 901 F.3d 772, 780 (7th Cir. 2018). Because officers in the field are often required to make "split-second decisions of enormous consequence," it is critical to keep in mind that they

"do not have the luxury of knowing the facts as they are known to us, with all the benefit of hindsight, discovery, and careful analysis." *Id.* When attempting to understand the perspective of officers at the scene, courts must consider: 1) the information known to them at the time of the encounter; 2) the duration of the encounter; 3) the level of duress involved; and 4) the "need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances." *Id.* (citing *Horton,* 883 F.3d at 950).

"To establish a Fourth Amendment denial of medical care claim, [plaintiff] must establish that (1) defendants' failure to provide him with medical care was objectively unreasonable under the circumstances, and (2) defendants' conduct caused him harm." *See Williams*, 509 F.3d at 403; *Lopez*, 464 F.3d at 718-19.

Courts look to four factors to assist their analysis of whether an officer's response to a pretrial detainee's medical needs was objectively unreasonable: "(1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Ortiz*, 656 F.3d at 530. However, "one should not fixate on factors" as "[r]easonableness in light of the totality of the circumstances remains the constitutional touchstone…" *Florek v. Village of Mundelein, Ill.,* 649 F.3d 594, 599-600 (7th Cir. 2011).

The Fourth Amendment requires reasonableness, not immediacy. *Sallenger v. City of Springfield*, 630 F.3d 499 (7th Cir. 2010). Even where the officers could have acted faster, "the Constitution does not demand perfection." *Pulera v. Sarzant*, 966 F.3d 540, 555 (7th Cir. 2020) (officers' response to arrestee's attempted suicide was reasonable where officers waited a few seconds for back-up before entering cell to cut arrestee down, officers had pressure off arrestee's neck in two minutes and summoned ambulance less than five minutes).

"[T]he Fourth Amendment reasonableness inquiry necessarily takes into account the sufficiency of the steps that officers did take." *Florek,* 649 F.3d at 600-01. The Fourth Amendment does not require a law enforcement officer to provide what hindsight reveals to be the most effective medical care to an arrestee. *Id.* Promptly calling an ambulance after being notified of an arrestee's medical need "will typically qualify as reasonable." *Id.* (citing *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006) ("[A] police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment, even if the officer did not administer CPR.")); *see also Sallenger*, 630 F.3d at 503-04 (officers' actions not objectively unreasonable where, soon after realizing arrestee was unconscious and not breathing, officers removed restraint, began CPR, and summoned an ambulance); *Dukes v. Freeport Health Network Mem'l Hosp.*, No. 3:19-CV-50189, 2022 WL 1085208, at *17 (N.D. Ill. Apr. 11, 2022) (officer's response to arrestee's medical need was not objectively unreasonable where officer called for an ambulance immediately).

Lastly, in evaluating the medical need, the Seventh Circuit has held that a plaintiff "must also show that the defendants' conduct caused the harm of which she complains." *Ortiz*, 656 F.3d at 530 (citing *Gayton v. McCoy,* 593 F.3d 610, 620 (7th Cir.2010). Here, there is no evidence that Terry would not have died if Officer Reid had relayed additional details *of what he knew at the time* or if the Defendant Officers had approached Terry prior to when they did. ." *Siegel*, 612 F.3d at 937 (Summary judgment "is the put up or shut up moment in a lawsuit ").

### Officer Reid's actions were objectively reasonable.

Officer Reid's attempts to communicate critical information began before Terry's offensive concluded. Following the first two shots, Officer Reid reported "Shots Fired! Shots Fired!" which prompted all available units to respond to the scene.  [Fact, ¶ 80.] Within seconds

of firing the fourth and final shot, Officer Reid twice requested that an ambulance respond quickly to the scene, clearly communicating that medical care was required. [Facts, ¶¶ 88, 89.] Just seconds later, Officer Reid communicated that he had a "subject down." [Fact, ¶ 80.] These undisputed material facts illustrate that within seconds of fending off what he reasonably believed to be an attack on his life, and in the middle of a tense, rapidly evolving situation, Officer Reid relayed that: 1) a firearm had been discharged; 2) emergency medical care was needed; and 3) the subject was down.

For approximately the next two (2) minutes, Officer Reid maintained cover on Terry, ready to respond to any additional attack and further protect himself and the nearby civilians, if necessary. [Facts, ¶¶ 86, 87, 92-96.] As Officer Reid was still maintaining cover at the time backup arrived, it was apparent that the "subject down" to which Officer Reid referred just moments earlier was Terry. [Fact, ¶ 92] Once relieved by the responding Defendant Officers who were more able to take control of the active scene, Officer Reid backed away from the immediate area and attempted to calm himself. [Fact, ¶ 95]

Officer Reid was then assessed by EFD personnel on scene, whom he told that he was not hurt and that he was "fine." [Fact, ¶ 97.] From there, Officer Reid was met by Officer Jones, and the two went to Officer Jones' cruiser. [Fact, ¶ 99.] All the while, Officer Reid was clearly still shaken up by what had taken place, saying "Oh shit, oh shit…Oh God, oh God" and telling Officer Jones that he believed he was going to die. [Facts, ¶¶ 98, 104, 105.] Nevertheless, Officer Reid reported additional critical information, telling Officer Jones that the Jeep belonged to Terry and that Officer Jones needed to tell the Defendant Officers that Terry dropped something. [Facts, ¶¶ 100, 101.] Within minutes, Officer Jones drove Officer Reid to EPD headquarters to

begin the Officer-Involved Shooting investigation process per the EPD Operational Guidelines. [Fact, ¶ 106.]

Kristi asserts in her statement of claims that one of Officer Reid's failings is the fact that he did not inform the Defendant Officers that Terry did not have a gun. [Dkt. No. 123 at ¶ 1(b)(ii).] Kristi's argument is without merit, as the undisputed material facts show that Officer Reid believed that Terry possessed a firearm at that time, and therefore would not have relayed to the Defendant Officers that Terry did not possess a firearm. [Facts ¶ 76.] Her attempt to analyze Officer Reid's actions through the prism of hindsight should be easily disregarded, as Fourth Amendment precedent makes clear that officers' conduct is evaluated based upon what they knew at the time of the encounter. *See Graham*, 490 U.S. at 396.

All told, Officer Reid communicated that: 1) shots had been fired; 2) emergency medical personnel were needed right away; 3) the subject (Terry) was down; 4) Officer Reid was not hurt; 5) Officer Reid thought that he was going to die and therefore faced circumstances prompting his use of deadly force; and 6) that Terry had something in his hand that had been dropped. Officer's Reid's conduct was therefore reasonable under the circumstances, and he is entitled to summary judgment in his favor as to Kristi's claim that he failed to render medical aid.

### Officer Reid is Entitled to Qualified Immunity

### Standard

Even if the Court would find that Officer Reid's use of force and subsequent actions were not objectively reasonable, he is still entitled to summary judgment based on qualified immunity.

The Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law. *Messerschmidt v. Millender*, 565 U.S. 535 (2012)*.* In addition, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396-397.

The Supreme Court has identified two key inquiries for qualified immunity assertions: (1) whether the facts, taken in the light most favorable to the plaintiffs, show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223 (2009).

To be clearly established at the time of the challenged conduct, the right's contours must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right," and "existing precedent must have placed the statutory or constitutional question beyond debate." *Humphries v. Milwaukee Cnty.*, 702 F.3d 1003, 1006 (7th Cir. 2012). Therefore, the Supreme Court has repeatedly advised courts "not to define clearly established law at a high level of generality." *Kisela v. Hughes,* 138 S. Ct. 1148, 1152 (2018). In excessive force cases, "the result depends very much on the facts of each case," so officers are entitled to qualified immunity unless precedent "*squarely governs*" the case at hand. *Mullenix v. Luna,* 577 US 7, 13 (2015) (emphasis in original) (quoting *Brousseau v. Haugen,* 543 U.S. 194, 201 (2004)). This standard "protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can reasonably . . .

anticipate when their conduct may give rise to liability for damages." *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

In the summary judgment context, a government official need only plead qualified immunity, which then shifts the burden to the plaintiff. *Sparing v. Village of Olympia Fields,* 266 F.3d 685, 688 (7th Cir. 2001) (qualified immunity defense places the burden on the plaintiff to identify a closely analogous case establishing the constitutional right.) "[P]laintiff bears the burden of showing the existence of allegedly clearly established constitutional right." *Clash v. Beatty,* 77 F.3d 1045, 1047 (7th Cir. 1996). Since qualified immunity gives public officials the benefit of the doubt, this burden is a difficult one. *See Kernats v. O'Sullivan,* 35 F.3d 1171, 1176 (7th Cir. 1994).

Thus, "while the right to be free from excessive force is clearly established in a general sense, the right to be free from the degree of force employed in a particular situation may not have been clear to a reasonable officer at the scene." *Becker v. Elfreich*, 821 F.3d 920, 928 (7th Cir. 2016). "If officers of reasonable competence could disagree on [whether or not an action was constitutional, immunity should be recognized." *Estate of Rudy Escobedo v. Martin,* 702 F.3d 388, 404 (7th Cir. 2012) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202.

The 7th Circuit has held that police officers may employ deadly force to protect themselves from a suspect with a gun or when the officer believes the suspect has a weapon. *Helman, supra; Henning, supra*. "A police officer's immunity does not become less if his assailant is motivated to commit 'suicide by cop.'" *Lal v. California*, 746 F.3d 1112, 1118 (9th Cir. 2014). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct,

'[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

### Qualified Immunity Allows for Reasonable Mistakes

The United States Supreme Court has recognized,

> it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that, in such cases, those officials -- like other officials who act in ways they reasonably believe to be lawful -- should not be held personally liable. . . . The same is true of their conclusions regarding exigent circumstances.

*Anderson*, 483 U.S. at 641 (internal cite omitted). The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. *Pearson,* 555 U.S. at 231. An official making a discretionary decision is entitled to the protection of qualified immunity when a reasonable person in his position would not have appreciated that his conduct was illegal under the circumstances. *Seiser v. City of Chi.*, 762 F.3d 647, 658 (7th Cir. 2014) (internal cites omitted).

Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances and in those situations courts will not hold that they have violated the Constitution. *Saucier*, 533 U.S. at 206. "Yet, even if a court were to hold that an officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, *Anderson* still operates to grant officers immunity for reasonable mistakes as to the legality of their actions." *Id*. The same analysis is applicable in excessive force cases, where in addition to the deference officers receive on the underlying constitutional claim, qualified immunity can apply in the event the mistaken belief was reasonable. *Id*. "While the substantive constitutional standard protects officers' reasonable factual mistakes, qualified immunity protects

them from liability where they reasonably misjudge the legal standard." *Catlin v. City of Wheaton*, 574 F.3d 361, 369 (7th Cir. 2009)

Even if Officer Reid reasonably, but mistakenly, believed that exigent circumstances and an immediate safety threat existed, or that the law did not prohibit his use of force, deadly or otherwise, under the circumstances, he is still entitled to qualified immunity. "Reduced to its essential elements, if the public official's 'mistake as to what the law requires is reasonable, the official is entitled to the immunity defense.'" *Baird v. Bd. of Educ. for Warren Cmty. Unit Sch. Dist. No. 205*, 389 F.3d 685, 696 (7th Cir. 2004) (citing *Saucier*, 533 U.S. at 202). Courts have held that an officer's use of force from a reasonable but mistaken belief as to the presence of a gun can be objectively reasonable. *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001); *Hudspeth v. City of Shreveport*, 270 Fed. App. 332 (5th Cir. 2008); *see also Dorato v. Smith*, 2015 U.S. Dist. LEXIS 72888, *247-48 (D.N.M. 2015) (stating "if a reasonable officer would have either (i) perceived the cellular telephone to be a gun; or (ii) not have been able to tell what the object was, then [the officer's] actions were reasonable").

Simply put, Officer Reid did his job on the evening of October 28, 2019. He responded to what he believed would be a routine motor vehicle accident stop, and was soon forced to take swift action to protect himself and nearby civilians from what he reasonably perceived to be a deadly threat. [Facts, ¶¶ 15, 73-82.] Despite the magnitude of the circumstances and the distress he was experiencing following his use of force, Officer Reid continued to do his job, requesting back up and AMR to the scene, all while maintaining cover on Terry until backup arrived. [Facts, ¶¶ 86-95.] Once arriving officers took control of the scene, Officer Reid communicated that he was not hurt, that Terry had pointed something black at him, that Terry had dropped something, and that he (Officer Reid) thought he was going to die. [Facts, ¶¶ 97-104.] At the

very most, Officer Reid's actions were the result of a reasonable but mistaken belief as to the circumstances he was facing that day, in which case, qualified immunity would apply. *See Saucier,* 533 U.S. at 206. In any event, Kristi cannot meet her burden in demonstrating that every reasonable officer would have considered Officer Reid's conduct as violative of Terry's constitutional rights. *See Mullenix,* 577 U.S. at 11. Therefore, Officer Reid is entitled to qualified immunity.

## CONCLUSION

For the foregoing reasons, Officer Reid respectfully requests that the Court grant its Motion for Summary Judgment and award all other relief in its favor that is just and proper in the premises.

Respectfully submitted,

*/s/ Matthew S. Koressel*
Keith W. Vonderahe, 21908-82
Matthew S. Koressel, 35276-49
Karey L. Cain, 38044-82
ZIEMER, STAYMAN, WEITZEL & SHOULDERS, LLP
P. O. Box 916
Evansville, IN   47706-0916
Phone: (812) 424-7575
Fax: (812) 421-5089
E-mail: kvonderahe@zsws.com
          mkoressel@zsws.com
          kcain@zsws.com
Attorneys for Officer Reid

## CERTIFICATE OF SERVICE

I certify that on November 3, 2023, a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Mark E. Miller, Esq.
mmiller@indianalawonline.com

Rick A. Cory, Esq.
rcory@danks-danks.com

*/s/ Matthew S. Koressel*
Matthew S. Koressel